UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NICOLAS GARCIA, aka Nicholas Garcia, | NO: 10-CV-0349-TOR |
| Plaintiff, | ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| COUNTY OF SPOKANE, SHERIFF OZZIE KNEZOVICH in his representative and individual capacity, JAIL COMMANDER JOHN McGRATH, LT. DOE, SGT. SMITH, DEPUTY NATHAN FOO, and EIGHT UNKNOWN EMPLOYEES OF SPOKANE COUNTY, in their individual capacities, | |
| Defendants. | |

BEFORE THE COURT are the following motions: Defendant Smith's

Motion for Summary Judgment (ECF No. 64); Defendants County of Spokane,

Knezovich, McGrath, and Foo's Motion for Summary Judgment (ECF No. 74);

Defendants' Joint Motion to Exclude the Testimony of Winthrop Taylor (ECF No.

70); Defendants' Joint Motion in Limine (ECF No. 95); and Plaintiff's

Supplemental Motion in Opposition to Defendant's Joint Motion in Support of

Defendant's Motion to Exclude Testimony of Winthrop Taylor (ECF No. 158).[1]

These matters were considered without oral argument. The Court has reviewed the

briefing and the record and files herein, and is fully informed.

## BACKGROUND

On March 17, 2011, Plaintiff Nicolas Garcia filed his First Amended

Complaint, alleging violations of his constitutional rights under 42 U.S.C. § 1983

by Defendants while he was held as a pretrial detainee at the Spokane County Jail.

ECF No. 24 at 15. On September 12, 2012, and September 13, 2012, Defendants

filed motions for summary judgment on all of Plaintiff's claims. ECF Nos. 64, 74.

A hearing on Defendants' motions and pretrial conference was originally

scheduled for November 20, 2012; however, Plaintiff failed to appear at the

hearing. In light of Plaintiff's failure to appear, as well as his failure to meet

numerous other court-ordered deadlines throughout the proceedings, this Court

entered an Order on November 20, 2012, dismissing Plaintiff's case with

prejudice. ECF No. 122.

---

[1] Although filed as a motion, this document is more aptly characterized as

Plaintiff's Response to Defendants' Joint Motion to Exclude the Testimony of

Winthrop Taylor.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 2

On April 15, 2014, the Ninth Circuit reversed this Court's dismissal and remanded the case for further proceedings, which mandate took effect on May 8, 2014.  ECF Nos. 144, 145.  The parties engaged in a settlement conference before Magistrate Judge Hutton on August 6, 2014; however, the parties failed to reach a settlement.  ECF No. 151.  Accordingly, this Court directed Plaintiff to file supplemental responses, if any, to Defendants' previously filed motions and set a new hearing date to address all pending motions.  ECF No. 154.

## FACTS

At all times relevant to this action, Plaintiff was temporarily confined at the Spokane County Jail as a pretrial detainee.  ECF Nos. 67 at 1; 76 at 2; 103 at 2.  On September 8, 2009, Defendant Captain McGrath, a Spokane County Sheriff's Office employee, entered into a contract with Tower Productions, which permitted the film company access to the Spokane County Jail to film a segment for the television series "Behind Bars" on the Discovery Channel.  ECF Nos. 76 at 2; 108 at 2; 163-2 at 2-3.  In exchange for a $5,000 location fee provided to the Spokane County Jail, the agreement afforded the company "the non-exclusive, irrevocable right to photograph and record the property, including any signs, displays, names, employees, inmates and the like," as well "access to and from [Spokane County Jail], including cell checks, cell extractions and cell transfers, the right to bring [Tower Productions] personnel and equipment onto the Property and to remove the

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 3

same after completion of production."  ECF No. 163-2 at 2.  The agreement also afforded Tower Productions exclusive ownership of all rights to all video taken on the premises and ability to "use said pictures and recordings in any manner in which [it] or its licensees may desire without limitation of any kind."  *Id*. at 3.

On September 21, 2009, jail staff allegedly received a tip that an inmate possessed a "shank" and that there would be a possible "shanking" taking place the following day,[2] as well as information that medications were being traded.  ECF No. 76 at 2; *see* ECF No. 65 at 5 (report stating Defendant Smith "received information via an Email from Sgt Tyler that 4 West needed to be Shook down because of a possible . . . note an inmate wrote that he was afraid he may be 'shanked' on Monday.").  In response, a Corrections Response Team ("CRT") was assigned to complete a "call-out," or cell-by-cell search, of the Fourth Floor West Pod, the area in which Plaintiff's cell was located.[3]  ECF Nos. 67 at 2; 76 at 2; 78

---

[2] Plaintiff disputes the existence of the alleged "shank" or other contraband, arguing that it was a rumor with no basis in fact that was used to justify gathering footage for Tower Productions.  ECF No. 108 at 2.

[3] The CRT is a team trained to handle violent inmates.  ECF Nos. 24 at 8; 34 at 5; 35 at 6.  One of the duties of the CRT is to perform involuntary extractions of inmates from their cells when the inmates present a risk of harm to officers who need to enter a particular cell.  ECF Nos. 24 at 8; 34 at 5; 35 at 6.  The CRT

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 4

at 2.  Defendant Foo was the lead CRT officer that conducted the cell-by-cell

search.[4]  ECF No. 76 at 2.  According to Defendant Sergeant Smith, a supervisor

for the CRT, the standard procedure during a cell-by-cell search is to ask each

inmate to be voluntarily handcuffed, whereupon the inmate is taken to the shower

area for a strip search while members of the CRT search his cell for contraband.

ECF No. 67 at 2.  Plaintiff disputes that an authorized "cell by cell search"

members carry special gear; cover their faces with masks; wear knee pads, elbow

pads, and gloves; and obscure any identifying marks or name badges.  ECF Nos.

24 at 9; 34 at 5; 36 at 6.

[4] Although Defendant Smith worked with the CRT, he maintains that he was not

personally involved in any of the actual events.  ECF No. 67 at 2.  Defendant

Smith asserts that he did not enter Plaintiff's cell, did not help subdue and handcuff

Plaintiff, did not help transport Plaintiff to the shower, was not present during the

strip search, did not authorize or permit the film crew to film Plaintiff's strip

search, and did not help transport Plaintiff to the temporary jail cell after the strip

search.  *Id.* at 2-3.  Plaintiff concedes that Defendant Smith did not enter his cell,

ECF No. 103 at 2, but contests Defendant Smith's participation and role in other

aspects of the extraction and strip search, *id.* at 2-5.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 5

procedure exists, and his review of the Spokane County Jail Operations Manual found no reference to voluntary handcuffing or strip searching.[5]  ECF No. 103 at 4. The CRT officers approached Plaintiff's cell and commanded that he put his hands out the food slot for handcuffing.  ECF Nos. 67 at 2; 76 at 2; 100 (unedited video footage).  Plaintiff did not comply with these instructions.[6]  ECF Nos. 67 at 2; 76 at 2; 100 (unedited video footage).  In the video footage, Plaintiff is seen at one

_____

[5] Although Plaintiff includes an excerpt of the Policy, *see* ECF No. 102-2, the excerpt does not include the relevant section as cited by Plaintiff; thus, the Court is unable to make a finding as to the standard procedure for a cell-by-cell search.

[6] Defendant Foo's report of the incident states the following regarding Plaintiff's noncompliance:

> I opened the food slot and ordered Inmate Garcia to back up to the door and put his hands out the food slot.  Inmate Garcia refused that order and asked why we wanted him to come to the door.  I told him to follow the order.  I repeated the order and Inmate Garcia asked to know why again.  He was told again to follow directions.  Inmate Garcia went to the sink in his cell wetting his hands and running them through his hair.  He did this twice before I gave him the order one more time. Inmate Garcia refused again asking why.

ECF No. 78-1.  Plaintiff disputes this testimony and highlights that his hair shows no signs of water in the video footage.  ECF No. 108 at 3.  Further, Plaintiff maintains that he was not intentionally non-responsive but was still "half-asleep" when the officers came to his cell.  ECF Nos. 102 at 2-3; 108 at 3.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 6

point peering through the window on his cell door and subsequently receding from

the window during the CRT's repeated commands.  ECF No. 100 (unedited video

footage).  Plaintiff admits that he "did not immediately respond to the command to

place his hands through the hatchway but instead returned to his bed."  ECF No. 24

at 10.  After the third verbal command to "come to the door and cuff up" went

unanswered, Defendant Foo gave the command for CRT members to enter

Plaintiff's cell.  ECF Nos. 76 at 3; 100 (unedited video footage).  The officers

immediately physically subdued Plaintiff on the ground, with his head and

shoulders under the cell bed.[7]  ECF No. 76 at 7.  CRT members handcuffed

Plaintiff and bent his legs at the knees and ankles, likely in response to one

officer's admonishment to Plaintiff to "quit kicking against me."[8]  ECF No. 100

---

[7] Defendant Foo maintains that he did not have any physical contact with Plaintiff

when his team entered the cell.  ECF No. 76 at 3.  In response, Plaintiff states that

he cannot knowingly admit that Defendant Foo did not have any contact, ECF No.

108 at 3; however, the evidence demonstrates that three CRT officers subdued and

restrained Plaintiff while Defendant Foo appears to have remained back during the

extraction, ECF No. 100 (unedited video footage).

[8] Plaintiff states that the officers applied a "counter-joint" lock technique and a

"knee strike" and a "knee hold" as outlined in the "Continuum Ladder of Force" he

submits as evidence.  ECF No. 102 at 4; *see* ECF No. 102-2 at 4.  However, upon

(unedited video footage).  Plaintiff then verbally agreed to comply with instructions and was removed from his cell.  CRT officers then escorted[9] Plaintiff to the shower where they performed a strip search.  ECF Nos. 76 at 3-4; 100 (unedited video footage).  During the strip search, CRT officers ordered Plaintiff to take off his jumpsuit and underwear, move his penis and testicles (including rolling back his foreskin, which he claims he does not have because he is circumcised), and bend over and spread his buttocks. [10]  ECF No. 100 (unedited video footage).

review of the evidence, the Court cannot confirm that these methods were actually used.

[9] Plaintiff asserts that CRT officers escorted him using a "painful joint-locking technique."  ECF No. 24 at 10.  In response, Defendants contend the CRT officers used "a technique that was trained and is an accepted practice" and is "used to maintain control over an inmate who had been previously noncompliant."  ECF Nos. 76 at 4; 78 at 4.  According to Defendants, the technique "allows the officer to keep control over the inmate by giving [the officer] control over the inmate's shoulder and head."  ECF No. 78 at 4.

[10] The majority of the footage is confined to Plaintiff's upper torso; however, there are several instances where the viewer can see Plaintiff's underwear.  ECF No. 100 (unedited video footage).  Plaintiff testified that he was not aware of the cameras until he removed his underwear.  ECF No. 77-1 at 4.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 8

All of the foregoing events, including the strip search, were filmed by a third-party camera crew pursuant to the jail's agreement with Tower Productions, Inc. *See* ECF No. 100 (unedited video footage). According to Plaintiff, the film crew included at least one female. ECF No. 24 at 11.

After the strip search, CRT officers transported Plaintiff to a temporary cell while other jail staff conducted a search of the cells. ECF Nos. 76 at 5; 108 at 4. There is no video footage of the events following the strip search. Plaintiff contends that, at this time, the officers who conducted the strip search were then "rotated with other officers" who came into the shower, tackled Plaintiff, and bound his limbs in a "four point/hog tie." ECF No. 102 at 10. He states that he was "tossed" into his temporary cell belly down with his limbs still restrained. *Id.* at 11. Plaintiff further declares that he was pushed and kicked in order to get his entire body completely under the cell bed, *id.* at 11-12, and that, as a result of being forced under the bed so tightly, it was impossible for him to move out from underneath the bed until an officer later forcibly removed him, *id.* at 12. Plaintiff maintains that he shouted for medical attention while he was under the bed but received no care and has sustained multiple permanent injuries as a result. *Id.* at 12-13

Defendants, on the other hand, contend officers placed Plaintiff on the floor on his belly, removed his handcuffs, directed Plaintiff to cross his legs, and slid

1   him under the bunk.  ECF No. 76 at 5; *see also* ECF No. 78-1 at 2 (Defendant

2   Foo's report stating "[Mr. Garcia] was placed on the floor face down on his belly.

3   The handcuffs were removed and Inmate Garcia was slid halfway under bed.")

4   According to Defendants, "[t]his is standard practice when an inmate has been

5   uncooperative and allows the corrections officers time to safely exit the cell;"

6   however an "inmate may come out from under the bunk whenever he wants."  ECF

7   No. 76 at 5.

8       In his First Amended Complaint, Plaintiff alleges violations of the Fourth

9   and Fourteenth Amendments, including use of excessive force on a pretrial

10  detainee and unreasonable search during a filmed strip search, against Spokane

11  County and several officers of the Spokane County Jail.  *See* ECF No. 24.

12  Defendants move for summary judgment on all claims and against all Defendants.

13  *See* ECF Nos. 64, 74.

## DISCUSSION

### I.    Motions for Summary Judgment

#### A. Legal Standard

17       Summary judgment may be granted to a moving party who demonstrates

18  "that there is no genuine dispute as to any material fact and that the movant is

19  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party

20  bears the initial burden of demonstrating the absence of any genuine issues of

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 10

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to identify specific genuine issues of material fact which must be decided by a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* at 248. A dispute concerning any such fact is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* In ruling upon a summary judgment motion, a court must construe the facts, as well as all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Only evidence which would be admissible at trial may be considered. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

**B. Section 1983 Claims**

Plaintiff alleges two causes of action under 42 U.S.C. § 1983: excessive force and unreasonable search. A cause of action pursuant to section 1983 may be maintained "against any person acting under the color of law who deprives another 'of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *S. Cal. Gas Co., v. City of Santa Ana*, 336 F.3d 885 (9th Cir.

2003) (citing 42 U.S.C. § 1983).  The rights guaranteed by section 1983 are

"liberally and beneficently construed."  *Dennis v. Higgins*, 498 U.S. 439, 443

(1991).

### 1. Doe Defendants

As an initial matter, this Court must address the unidentified defendants that

remain in the caption of this action.  A plaintiff must name all intended defendants

in the caption of his complaint or any superseding amended complaint.  *See Ferdik*

*v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992).  Failing to name and serve all

defendants in the complaint denies a court jurisdiction over the unnamed

defendants.  Fed. R. Civ. P. 4(m); *see e.g.*, *Crowley v. Bannister*, 734 F.3d 967,

974-75 (9th Cir. 2013) ("A federal court is without personal jurisdiction over a

defendant unless the defendant has been served in accordance with Fed. R. Civ. P.

4.") (internal quotation marks and citations omitted).  Absent good cause, a court

must dismiss any defendant who is not served within 120 days after the complaint

is filed.  Fed. R. Civ. P. 4(m) (stating even if the plaintiff can show cause for

failure to serve, the court may only extend the time for service for an *appropriate*

period) (emphasis added).  The use of "John Doe" to identify a defendant is not

favored in the Ninth Circuit.  *See Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir.

1980).  However, a plaintiff may initially rely on the use of "John Doe" in his

pleading when the identity of a party is unknown prior to filing a complaint but

1   will eventually be made known through discovery.  *Id.* (holding that a plaintiff

2   should be permitted opportunity to conduct discovery to uncover the identities of

3   "John Doe" defendants).

4           Here, Plaintiff named Lieutenant Doe and Eight Unknown Employees of

5   Spokane County as defendants in his First Amended Complaint, filed March 17,

6   2011.  ECF No. 24.  Plaintiff has failed at this late stage in the proceedings to

7   identify these Doe Defendants by name.  The original deadline to amend pleadings

8   or add parties was June 16, 2011. [11]  ECF No. 32 at 3.  Plaintiff failed to amend his

9   First Amended Complaint to identify these unnamed Defendants before this

10  deadline.  The discovery cut-off in this action was October 1, 2012, extended from

11  the original discovery cut-off of August 30, 2012, upon Plaintiff's motion and

12  demonstration of good cause.  ECF No. 83.  But Plaintiff still failed to identify

13  these parties by name before this deadline.  Accordingly, because Plaintiff has

14  been afforded more than enough time to designate the identities of the Doe

15  Defendants but otherwise failed to, this Court dismisses Lieutenant Doe and Eight

16  Unknown Employees of Spokane County from this action.

17  //

18  //

19  ---
    [11] Neither the first or second amended scheduling orders altered this deadline.  *See*
20  ECF Nos. 49, 62.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 13

2. <u>Excessive Force</u>

This Court begins its analysis of Plaintiff's claim by discussing excessive force generally, and then applying the doctrine to the facts of this case, considering issues of municipal liability, supervisor liability, and qualified immunity where appropriate.

The Due Process Clause protects pretrial detainees from the use of excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386 n.10 (1989); *Lolli v. Cnty. of Orange*, 351 F.3d 410, 415 (9th Cir. 2003) ("[T]he Fourth Amendment sets the applicable constitutional limitations for considering claims of excessive force during pretrial detention."). In evaluating a Fourth Amendment claim of excessive force under 42 U.S.C. § 1983, courts must determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotation and citation omitted). "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 14

or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quotation and citation omitted); *see Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) ("[T]he most important *Graham* factor is whether the suspect posed an immediate threat to the safety of the officers or others.") (internal quotations and citations omitted). This calculus must account for the fact that police officers are often "forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Consequently, the objective reasonableness of an officer's use of force must be judged from the perspective of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). At bottom, the question is whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him or her. *Id.* at 397; *Mattos*, 661 F.3d at 441 (noting that courts should "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*").

Determining whether an officer's force was excessive or reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. Courts in the Ninth Circuit follow a

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 15

three-step analysis when considering the reasonableness of an officer's use of

force:

> First, we must assess the severity of the intrusion on the individual's
> Fourth Amendment rights by evaluating the type and amount of force
> inflicted.  Next, we must evaluate the government's interests by
> assessing (1) the severity of the crime; (2) whether the suspect posed
> an immediate threat to the officers' or public's safety; and (3) whether
> the suspect was resisting arrest or attempting to escape. Third, we
> balance the gravity of the intrusion on the individual against the
> government's need for that intrusion.  Ultimately, we must balance the
> force that was used by the officers against the need for such force to
> determine whether the force used was "greater than is reasonable
> under the circumstances.

*Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (internal

quotation marks and citations omitted).  "Because the excessive force inquiry

nearly always requires a jury to sift through disputed factual contentions, and to

draw inferences therefrom . . . summary judgment or judgment as a matter of law

in excessive force cases should be granted sparingly."  *City of Hemet*, 394 F.3d

689, 701 (9th Cir. 2005) (en banc) (internal quotation marks and citation omitted).

Here, Plaintiff's excessive force claim covers two separate events: First,

whether the CRT officers used unreasonable force when they subdued and

restrained Plaintiff and subsequently escorted him to the shower for the strip

search.  Second, whether the CRT officers used unreasonable force when, after the

strip search, they placed Plaintiff under the bed in his temporary cell.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 16

First, regarding the CRT officers' extraction of Plaintiff from his cell and transport to the shower, Defendants summarily argue that the use of force was reasonable considering Plaintiff's refusal to follow Defendant Foo's repeated commands to "cuff up."  ECF No. 75 at 16.  Defendants contend that the tactics and techniques used when subduing and restraining Plaintiff were within the CRT's policies and procedures.  *Id.*  Further, Defendants argue that Plaintiff fails to set forth evidence of "excessive force" other than his own testimony, including any medical or causation evidence regarding his alleged injuries.  *Id.* at 17-18.

Plaintiff, on the other hand, asserts that in light of his behavior, the officer's use of force was unreasonable and "employed solely to create a spectacle and to capture action footage for the camera crew."  ECF No. 102 at 7.  Plaintiff contends that he neither resisted the officers, nor became aggressive or assaultive; as such, the CRT officers' use of force was not warranted.  *Id.* at 3.  However, despite Plaintiff's lack of aggression, the CRT officers applied a "counter-joint" lock technique, as well as a "knee strike" and a "knee hold" in order to subdue Plaintiff and place him in restraints.  *Id.* at 3-4.  Even after he confirmed that he would follow instructions, Plaintiff maintains the officers escorted him to the shower in a painful "joint-lock technique."  ECF Nos. 24 at 10; 102 at 6-7.  As a result of the foregoing events, Plaintiff declares that he sustained permanent injuries to his left shoulder and his left knee.  ECF No. 102 at 5.

After reviewing the videotaped events in Plaintiff's cell, in addition to the documents submitted by both parties, the Court finds that Plaintiff has presented evidence from which a rational jury could find the force applied to Plaintiff was in excess of what would have been objectively reasonable under the circumstances. On the one hand, the evidence, as well as Plaintiff's own admission, demonstrates that Plaintiff defied the CRT officer's repeated verbal commands to come to the door to be voluntarily handcuffed. The fact that Plaintiff refused to be compliant, especially in light of the fact that the CRT officers were searching for possession of deadly weapon by an inmate, *see Mattos*, 661 F.3d at 441, weighs in favor of finding that a reasonable officer on the scene would have physically subdued, and subsequently restrained, Plaintiff in the manner shown on the tape. Further, the fact that this incident occurred in the custodial setting must be viewed in light of the institutional goal to preserve order and discipline amongst inmates, and to protect both the officers and the other inmates from possible physical harm. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel . . . [and] even when an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding, and institutional security.").

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 18

1    Nonetheless, even if the CRT officers' use of force was reasonably justified

2    based on the circumstances, it remains a question for a jury if the amount of force

3    used to initially subdue and restrain Plaintiff and subsequently transport him to the

4    shower, after he expressly promised to follow instructions, was objectively

5    reasonable.  *See Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985) (rejecting argument

6    that police officer with probable cause may use *whatever* force necessary to

7    effectuate a lawful arrest).  The fact that Plaintiff was initially non-compliant and

8    possibly in possession of a weapon are merely factors to be considered in assessing

9    the reasonableness of the CRT officers' use of force under the totality of the

10   circumstances.  *See Espinosa*, 598 F.3d at 537.  Accordingly, a jury must decide

11   whether, based upon their assessment of the disputed evidence, Defendants' level

12   of force was objectively reasonable.

13       Second, with regards to Plaintiff's placement in a temporary cell after the

14   strip search, Defendant Foo testified that it is standard practice to place an inmate

15   who has been uncooperative underneath the cell bed—belly down, hands behind

16   his back, legs crossed—to allow the officers time to safely exit the cell.  ECF No.

17   76 at 5.  According to Defendant Foo, Plaintiff's handcuffs were removed before

18   Plaintiff was "slid underneath the bunk."  ECF No. 78 at 4.  Defendant Foo also

19   testified that Plaintiff was free to come out from under the bed whenever he

20   wished.  *Id.* at 5.  Plaintiff, on the other hand, contends he was "tossed" into the

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 19

1    cell belly down, left in restraints, kicked and pushed under the bed, and left there,

2    pinned in and unable to move, for an undisclosed period of time.  ECF No. 102 at

3    11-12.  Plaintiff also testified that his left shoulder and right thigh were injured but

4    no medical attention was provided and no officer came to check on his condition

5    "for hours."  *Id*. at 12-13.

6         Again, this Court finds genuine issues of material fact remain as to whether

7    the CRT officers used excessive force when placing Plaintiff underneath the bed

8    after the strip search.  As noted above, Plaintiff was initially non-compliant when

9    the CRT officers extracted Plaintiff from his cell.  However, once the officers

10   subdued Plaintiff, he agreed to follow instructions.  Thus, although Defendants

11   maintain that the placement of Plaintiff underneath the bed was in line with

12   standard procedure with uncooperative inmates, there exists a genuine dispute as to

13   the how much force the CRT officers used when placing Plaintiff underneath the

14   cell bed and if that amount of force was reasonably necessary considering the

15   circumstances.  Accordingly, this Court declines to grant summary judgment on

16   Plaintiff's excessive force claim.

17        This Court must now determine against which governmental defendants

18   Plaintiff's excessive force claim is properly asserted.

19   //

20   //

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 20

       *i.  County of Spokane*

In his First Amended Complaint, Plaintiff asserts his excessive force claim against the County of Spokane, a municipality.  ECF No. 24.  The Supreme Court has held that local governments are "persons" who may be subject to suits under § 1983.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).   However, a municipality may only be held liable for constitutional violations resulting from actions undertaken pursuant to an "official municipal policy."  *Id*. at 691.  As the Supreme Court articulated in *Monell*, the purpose of the "official municipal policy" requirement is to prevent municipalities from being held vicariously liable for unconstitutional acts of their employees under the doctrine of respondeat superior. *Id.*; *see also Bd. of Cnty. Comm'rs  v. Brown*, 520 U.S. 397, 403 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-79 (1986).  Thus, the "official municipal policy" requirement "distinguish[es] acts of the *municipality* from acts of *employees* of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible."  *Pembaur*, 475 U.S. 469, 479-80 (1986) (emphasis in original) (footnote omitted).

The Ninth Circuit recognizes four categories of "official municipal policy" sufficient to establish municipal liability under *Monell*: (1) action pursuant to an express policy or longstanding practice or custom; (2) action by a final policymaker acting in his or her official policymaking capacity; (3) ratification of

an employee's action by a final policymaker; and (4) failure to adequately train employees with deliberate indifference to the consequences. *Christie v. Iopa*, 176 F.3d 1231, 1235-40 (9th Cir. 1999). A plaintiff must also establish the requisite causal link between this "policy" and the alleged constitutional deprivation. *See Harper v. City of L.A.*, 533 F.3d 1010, 1026 (9th Cir. 2008). The Supreme Court articulated the causation requirement as follows:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct casual link between the municipal action and the deprivation of federal rights.

*Bd. of Cnty. Comm'rs*, 520 U.S. at 404. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *Id.* at 405.

This Court finds that Plaintiff has failed to present sufficient evidence to establish municipal liability and overcome summary judgment as to his excessive force claim against Spokane County. First, Plaintiff fails to allege any action by a "final policymaker" acting in his or her official policymaking capacity, let alone identify any Defendant or other individual who may have acted as a final

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 22

policymaker. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability."). Second, Plaintiff asserts no allegations, nor provides any evidence, that a final policymaker ratified the CRT officers' actions. *See Christie*, 176 F.3d at 1235-40 (knowledge of an unconstitutional act is not enough to constitute ratification, rather "a plaintiff must prove that the policymaker approved of the subordinate's act"). Third, Plaintiff does not allege, much less present any evidence, that Spokane County failed to adequately train employees with deliberate indifference to the consequences. *See City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.").

The only remaining category of municipal liability under *Monell* is whether Plaintiff has established the actions of the CRT officers were pursuant to an express policy or longstanding practice or custom of the County. True, Defendants contend that the actions of the CRT officers when extracting Plaintiff from his cell, transporting him to the shower, and relocating him into a temporary cell followed "standard practices" of the jail. *See* ECF No. 78 at 3-5. However, Plaintiff has failed to put forth any evidence or allegation that it was the practice and policy of

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 23

the County to use excessive force when subduing and restraining an inmate or to use extreme physical force to place an inmate under the bed and leave him there while still in restraints.

Even if Plaintiff were able to demonstrate the conduct of the CRT officers was pursuant to the County's policy, he has failed to demonstrate that the County was the "moving force" or otherwise provide evidence of a causal link between the County's action and the deprivation of his rights. Rather, Plaintiff alleges that it was the *individual actions of the CRT members* who left him in restraints, pushed and kicked him, and left him for several hours without medical attention. *See Bd. of Cnty. Comm'rs*, 520 U.S. at 406-07 ("That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably.").

Accordingly, even in the light most favorable to Plaintiff, the Court finds no genuine issue of material fact that the alleged constitutional violation was undertaken pursuant to "official municipal policy." Therefore, Plaintiff's excessive force claim, as applied to Spokane County, is dismissed.

### ii. *Defendants Knezovich, McGrath, and Smith*

Plaintiff also asserts his excessive force claim against Defendants Knezovich, McGrath, and Smith. As indicated in the previous section, vicarious

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 24

liability is inapplicable to a § 1983 claim, thus, "a plaintiff must plead that each

Government-official defendant, through the official's own individual actions, has

violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  A

defendant supervisor may be held liable for his or her own actions "if there exists

either (1) his or her personal involvement in the constitutional deprivation, or (2) a

sufficient causal connection between the supervisor's wrongful conduct and the

constitutional violation."  *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989); *see

also Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978) ("[R]equisite causal

connection can be established . . . by setting in motion a series of acts by others

which the actor knows or reasonably should know would cause others to inflict the

constitutional injury.").  Specifically, the Ninth Circuit has held that "supervisors

can be held liable for: 1) their own culpable action or inaction in the training,

supervision, or control of subordinates; 2) their acquiescence in the constitutional

deprivation of which a complaint is made; or 3) for conduct that showed a reckless

or callous indifference to the rights of others." *Cunningham v. Gates*, 229 F.3d

1271, 1292 (9th Cir. 2000).

Defendants argue that there is no evidence to establish that Defendants

Knezovich, McGrath, or Smith were personally involved in the events surrounding

Plaintiff's excessive force claim.  ECF Nos. 66 at 2-4; 75 at 11.  Regarding

Defendants Knezovich and McGrath, Defendants highlight that Plaintiff has not

1   put forth one piece of evidence to show that either Defendant was present, aware,

2   or involved in the incident.  ECF No. 75 at 11.  Regarding Defendant Smith,

3   Defendants contend that, although Smith was a supervisor for the CRT, there is no

4   evidence demonstrating that he entered Plaintiff's cell, helped subdue and restrain

5   Plaintiff, helped transfer Plaintiff to the shower, or helped place Plaintiff in the

6   temporary cell after the strip search.  ECF No. 66 at 3.

7        Plaintiff, responding as to Defendant Smith's role only, relies on Defendant

8   Smith's police report stating that he "activated the CRT and had them report to the

9   roll call room for a briefing and to prepare Shakedown 4West to look for a possible

10  shank on the floor."  ECF No. 103 at 4-5; *see* ECF Nos. 24, 107 (failing to allege

11  or brief Defendant McGrath's and Knezovich's involvement in the events

12  surrounding Plaintiff's excessive force claim); *see* ECF No. 65 at 5 (Defendant

13  Smith reporting the CRT actions).  Further, Defendant Smith states in his report

14  that "we entered 4West" and proceeded to inmate Garcia's cell.  ECF No. 65 at 5.

15  Plaintiff argues that the use of the word "we," along with Defendant Smith's

16  activation of the CRT team, is sufficient evidence to deem Defendant Smith as a

17  participant in the extraction and subsequent relocation to the temporary cell.  ECF

18  No. 103 at 4-5.

19       This Court finds no evidence, or even any allegations, that Defendants

20  Knezovich and McGrath, were involved in the events either before or after the strip

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 26

1    search, nor that either of these Defendants acted, or failed to act, with deliberate

2    indifference to violations committed by their subordinates.  *See Taylor v. List*, 880

3    F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional

4    violations of his subordinates if the supervisor participated in or directed the

5    violations, or knew of the violations and failed to act to prevent them.").

6    Accordingly, Plaintiff's excessive force claim, as against Defendants Knezovich

7    and McGrath is dismissed.

8        However, this Court finds a genuine issue of material dispute as to

9    Defendant Smith.  Although, Defendant Smith may have had no personal

10   involvement in the events following the strip search, his role in the "call out" as

11   evidenced by his report, *see* ECF No. 65 at 5, creates a genuine issue of material

12   dispute as to whether he may be liable for culpable action or inaction in the

13   training, supervision, or control of subordinates; acquiescence in Plaintiff's alleged

14   constitutional deprivation; or reckless indifference to Plaintiff's constitutional

15   rights.  *See Cunningham*, 229 F.3d at 1292.  Accordingly, this Court will now

16   assess whether Defendant Smith, as well as Defendant Foo, are entitled to qualified

17   immunity.

18        *iii.  Defendants Foo & Smith*

19        Qualified immunity shields government actors from civil damages unless

20   their conduct violates "clearly established statutory or constitutional rights of

which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S.

223, 231 (2009). "Qualified immunity balances two important interests—the need

to hold public officials accountable when they exercise power irresponsibly and the

need to shield officials from harassment, distraction, and liability when they

perform their duties reasonably." *Id.*

In evaluating a state actor's assertion of qualified immunity, a court must

determine (1) whether the facts, viewed in the light most favorable to the plaintiff,

show that the defendant's conduct violated a constitutional right; and (2) whether

the right was clearly established at the time of the alleged violation such that a

reasonable person in the defendant's position would have understood that his

actions violated that right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in*

*part by Pearson*, 555 U.S. 223. A court may, within its discretion, decide which of

the two prongs should be addressed first in light of the particular circumstances of

the case. *Pearson*, 555 U.S. at 236. If the answer to either inquiry is "no," then

the defendant is entitled to qualified immunity and may not be held personally

liable for his or her conduct. *Glenn v. Wash. Cnty.*, 673 F.3d 864, 870 (9th Cir.

2011). In order to find that a right has been clearly established, the court should

consider the following:

> [I]ts contours must be sufficiently clear that a reasonable official would
> understand that what he is doing violates that right. This is not to say that an
> official action is protected by qualified immunity unless the very action in

question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).

Defendant Smith contends that the CRT officers did not violate Plaintiff's clearly established constitutional rights in light of Plaintiff's noncompliance.  ECF No. 66 at 7.  Defendant Foo contends that Plaintiff fails to articulate any action taken by Defendant Foo or rebut Defendant Foo's claim that he did not have "hands on" with inmates as CRT leader.  ECF No. 116 at 5.  However, the Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which is he legally required to do that causes deprivation of which complaint is made."  *Johnson*, 588 F.2d at 743.  Although it may be that Defendant Foo did not have physical contact with Plaintiff, Defendant Foo does concede that he was present for the transportation of Plaintiff to the temporary cell and placement of Plaintiff under the cell bed.  ECF No. 78 at 4-5.  Thus, the Court finds undisputed evidence in the record to indicate that Defendant Foo at the very least participated in the other CRT's affirmative acts, as he was present and involved at every stage of the events, regardless of whether he physically had his "hands on" Garcia.  *See Johnson*, 588 F.2d at 743.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 29

1    The same genuine issues of material fact that preclude summary judgment

2    on Plaintiff's excessive force claim precludes dismissal on qualified immunity

3    grounds.  As explained above, there are genuine issues of material fact surrounding

4    whether CRT officers use of force was reasonable when initially subduing and

5    restraining Plaintiff, transporting Plaintiff to and from the shower, and placing

6    Plaintiff underneath the cell bed following the strip search.  If credited by a jury,

7    Plaintiff's allegations, as detailed above, could support a finding that Defendants

8    used objectively *un*reasonable force under the circumstances confronting them

9    during the events surrounding Plaintiff's excessive force claim. Accepted as true,

10   this evidence further establishes that the Fourth Amendment right at issue was

11   clearly established.  *See, e.g.*, *Garner*, 471 U.S. at 7-8; *Graham*, 490 U.S. at 396;

12   s*ee also Espinosa*, 598 F.3d at 532 (finding it premature to find qualified immunity

13   and grant summary judgment when there remained unresolved issues of fact

14   regarding whether the officers violated the plaintiff's Fourth Amendment rights

15   and, relatedly, whether the officers' belief in the legality of their actions was

16   reasonable).  Accordingly, this Court declines to dismiss Plaintiff's excessive force

17   claim as against Defendants Smith and Foo.

18           3. Unreasonable Search

19       The Fourth Amendment protects the right to be free from unreasonable

20   searches.  U.S. Const. amend. IV.  Pretrial detainees retain some Fourth

Amendment rights after being confined to a corrections facility.  *Bell*, 441 U.S. at 558; *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988) (Fourth Amendment right against unreasonable search "extends to incarcerated prisoners; however, the reasonableness of a particular search is determined by reference to the prison context.").  The Supreme Court has stated that "when a prison regulation impinges on an inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  Moreover, prison officials should be accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and maintain institutional security."  *Bell*, 441 U.S. at 547.

When determining the reasonableness of a search, a case-by-case "balancing of the need for the particular search against the invasion of personal rights that the search entails," courts consider the following factors: (1) "the scope of the particular intrusion," (2) "the manner in which it is conducted," (3) "the justification for initiating it," and (4) "the place in which it is conducted."  *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (quoting *Bell*, 441 U.S. at 559).

The Ninth Circuit has held that the non-emergency, cross-gender strip search unreasonable as a matter of law in violation of the Fourth Amendment.  *See Byrd*,

629 F.3d at 1147.  In *Byrd*, jail officials, including one female officer, conducted a non-emergency strip search of male in front of ten to fifteen non-participating officers, and at least one person videotaped the search.  *Id*. (citing *York v. Story*, 324 F.2d 250, 455 (9th Cir. 1963) (noting the "indignity" of the strip search was "compounded by the fact that there were onlookers, at least one of whom videotaped the humiliating event")).  The court emphasized that "the desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity."  *Id*. at 1141 (quoting *York*, 324 F.2d at 455).   Further, the Ninth Circuit reiterated the "undisputed recognition of the feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers."  *Id.* at 1136 n.1 (quoting *Way v. Ctny. of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006)).

### i.    Defendant Knezovich

This Court finds no evidence, or even any allegations, that Defendant Knezovich was present during the strip search or that he authorized the film crew to film the strip search.  Accordingly, because Plaintiff has failed to plead any allegations that Defendant Knezovich—through his own actions—has violated the Constitution, *see Iqbal*, 556 U.S. at 676, Plaintiff's unreasonable search claim, as against Defendant Knezovich, is dismissed.

//

ii.    *Defendant Smith*

Defendant Smith contends that, although he was a supervisor for the CRT, there is no evidence demonstrating that he was present during the strip search or that he authorized the film crew to film the strip search.  ECF No. 66 at 3.  In response, Plaintiff asserts that Smith "undeniably was aware of the filmed strip search" and "undeniably perjures himself through his misrepresentations and contradictions" on his police report; that is, although Defendant Smith asserted that he did not enter Plaintiff's cell and was not involved in the extraction, his use of "we" on his police report suggests otherwise.  ECF No. 103 at 5.  Further, Plaintiff contends that as shift commander, Smith "had control and was responsible for the film crew's presence and was therefore involved in the decision to have a film crew present in the jail." *Id.*  In his reply, Defendant Smith does not provide any objection to Plaintiff's characterization of Smith's role as shift commander.  *See* ECF No. 118.

This Court finds a genuine issue of material fact remains as to Defendant Smith's supervisory role in allowing the film crew to document the CRT officer's strip search of Plaintiff.  *See Taylor*, 880 F.2d at 1045 ("A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.").  Defendant Smith fails to brief why the strip search was not a violation of

Plaintiff's Fourth Amendment Rights, nor why he is entitled to qualified immunity on this claim.[12]  Accordingly, summary judgment is inappropriate as to Defendant Smith regarding Plaintiff's unreasonable search claim.

### iv.  Remaining Named Defendants

Although the remaining Defendants move for summary judgment on all claims, Defendants fail to provide any argument as to why they are entitled to judgment on Plaintiff's unreasonable search claim.  Rather, Defendants Spokane County, McGrath, and Foo devote the entirety of their briefing to Plaintiff's excessive force claim.  Although Defendants acknowledge the strip search occurred, they provide no explanation under *Bell* or *Byrd* as to why the CRT's strip search was not a violation of Plaintiff's Fourth Amendment Rights, whether the County is similarly entitled to municipal liability on this claim, or whether the remaining defendants should be afforded qualified immunity or are otherwise improper defendants under section 1983.  Accordingly, this Court declines to grant summary judgment on Plaintiff's unreasonable search claim as to all other remaining Defendants without any briefing in support.

//

//

---

[12] In his briefing, Defendant Smith's qualified immunity defense is merely applied to Plaintiff's excessive force claim.  *See* ECF Nos. 66 at 4-7; 118 at 6.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 34

## II.    Joint Motion to Exclude Testimony of Winthrop Taylor

Expert witness testimony is governed by Federal Rule of Evidence 702, which provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court directed trial courts to perform a "gatekeeping" function to ensure that expert testimony conforms to Rule 702's admissibility requirements.  509 U.S. 579, 597 (1993). *Daubert* identifies four non-exclusive factors a court may consider in assessing the relevance and reliability of expert testimony: (1) whether a theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential error rate and the existence and maintenance of standards controlling the theory or technique's operation; and (4) the extent to which a known technique or theory has gained general acceptance within a relevant scientific community.  *Id.* at 593-94.  These factors are not to be applied as a "definitive checklist or test," but rather as guideposts which "may or may not be pertinent in assessing reliability, depending on the nature of the issue,

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 35

the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).  The ultimate objective is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The district court has "broad discretion in determining the admissibility of evidence and considerable leeway in determining the reliability of particular expert testimony." *Id.*

"It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (internal citation omitted).  However, "an expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on the ultimate issue of law." *Id.* (citation omitted).  Expert opinion on pure issue of law is inadmissible under Rule 702.  *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992).  "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997).

First, Defendants question the reliability of Taylor's opinions. Defendants assert that Taylor's opinions are based on nothing more than his own unsupported beliefs and subjective opinions, rather than specific, identifiable, and objective standards. ECF No. 71 at 5-7. Moreover, Defendants contend that Taylor has no experience in corrections and bases most of his opinions on his review of the relevant video footage. *Id.* at 7. Defendants cite to several portions of Taylor's deposition testimony to support their argument that Taylor does not have the requisite level of "specialized knowledge," including:

- Taylor's qualifying experience was obtained during his twenty-one years with the Los Angeles Police Department ("LAPD") and his three years as Chief of Police with the City of Prosser; however, during his twenty-one years with the LAPD, Taylor did not work in a jail but rather his position was limited to booking suspects, ECF Nos. 71 at 8; 72-1 at 18;

- As Chief of Police, Taylor was in charge of a jail that housed only as many as six inmates, the majority of which were being transferred or on work release, and although he did rewrite some provisions of the jail's policies and procedures, he could not recall any specifics, ECF No. 71 at 9;

- Since his termination as Chief of Police, Taylor has been self-employed as a private investigator, primarily criminal defense investigation, *id.* at 10;

- Taylor testified that he has taken continuing education classes, including a class regarding recent case law on the use of tasers; however, he could not remember the specifics of the other classes, and testified that he did not take classes on the use of force in jail settings, *id.*;

- In reviewing this case, Taylor spoke with other unnamed law enforcement professionals, but he has not interviewed Spokane County Corrections Officers, talked to the production crew, reviewed depositions or witness interviews, or spoken with Garcia himself, *id.* at 10-11.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 37

In sum, Defendants argue that Taylor's opinions do not meet the "expert standard" under *Daubert* because they are based largely on an "industry standard" he gained from his years in law enforcement in another state, which included little to no experience in corrections or jail training.

Second, Defendants question the relevance of Taylor's opinions. Defendants contend that because Taylor has no experience in corrections and no knowledge of Spokane County's training, practice, policies or procedures, but rather will be offering his opinion based on his interpretation of the facts within the record. *Id.* at 14-15. Therefore, Defendants assert that he cannot assist the trier of fact in determining whether excessive force was employed in this particular case. *Id.*

Finally, Defendants argue that Taylor's opinions are inadmissible legal conclusions. Defendants find fault with two opinions offered by Taylor:

- "The force that was used by the Deputies was **not objectively reasonable**; it was **excessive and unnecessary**. Additionally, I believe that it was **done for the benefit of the television production** that was in progress and **not out of any necessity to control Garcia**."

- [T]he act of placing Garcia on the floor face down and sliding him half way under the bunk, following the strip search, as was articulated by Foo leads credence to Garcia's allegation that he was left in that position, handcuffed, for at least 3-4 hours. There is no legitimate purpose for Foo placing Garcia on his face on the floor and sliding him under the bunk. Such action is inherently punitive in nature and is **not objectively reasonable**.

ECF No. 72-1 at 7-8 (emphasis added).

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 38

Despite his minimal experience in the custodial setting, the Court finds that Taylor is sufficiently qualified to offer expert testimony on use-of-force incidents under the "objectively reasonable" standard. Taylor's experience and knowledge is based on his many years as a police officer, during which time he was forced to make split second decisions about what is "reasonable" in a particular situation. Further, Taylor's experience and knowledge based on his experience operating a jail, as well as his extensive reviews of use-of-force incidents, make him a sufficiently reliable expert witness under *Daubert*.

This Court also finds that Taylor's opinion is relevant. When deciding Plaintiff's excessive force claim, the jury must consider only whether the amount of force used was objectively reasonable to an officer on the scene. Thus, Taylor may testify based on his experience as a law enforcement officer regardless of his knowledge of internal procedures at the Spokane County jail specifically. Defendants will have ample opportunity to challenge the credibility of Taylor's opinions through cross-examination. Further, Taylor is permitted to rely on his personal experience, as well as his review of the record, when rendering an opinion. Fed. R. Evid. 703; *Kumho Tire Co.*, 526 U.S. at 148.

However, this Court agrees that Taylor's opinions may invade the province of the jury. Taylor stands to testify that the CRT officers' actions were not "objectively reasonable" but "unnecessary" and "excessive." ECF No. 71-2 at 7-8.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 39

Insofar as these statements relate to the officer's use of alleged excessive force, post-strip search, such testimony is improper because it offers "an opinion on an ultimate issue of law," which is the exclusive province of the jury. *Hangarter*, 373 F.3d at 1016. Accordingly, Taylor should limit his testimony based on his personal law enforcement experience, as well as what facts, if found, would support a conclusion that Defendants' use of force was objectively reasonable, or conversely, excessive. However, Taylor should refrain from opining as to whether Defendants ultimately violated the Fourth Amendment. Accordingly, Taylor should limit his testimony in conformance with the above. The Court will entertain further direction and guidance to the parties as the trial proceeds.

### III.    Defendants' Joint Motion in Limine

A motion in limine is a request for the court's guidance concerning an evidentiary question. "In limine" has been defined as "on or at the threshold; at the very beginning; preliminarily." *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). A trial court has broad discretion when ruling on an evidentiary issue presented in a motion in limine. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008). A ruling on a motion in limine is "subject to change when the case unfolds," particularly if the actual trial testimony differs from what was proffered. *Luce*, 469 U.S. at 41. "Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous

in limine ruling." *Id.* at 41-42.

Defendants seek to exclude the following categories of evidence: (1) any testimony by Plaintiff regarding the use of force, the causal connection between the September 2009 events and his injuries, and his emotional distress that is not based on personal knowledge, ECF No. 96 at 3-9; (2) any evidence regarding Plaintiff's medical condition that he has not provided Defendants during discovery, *id.* at 7-8; and (3) any reference to Defendants' insurance coverage, *id.* at 11. The Court will address each request in turn.

First, this Court grants Defendants' first request, to the extent it limits Plaintiff's testimony to matters based on his own perception and personal knowledge. Federal Rule of Evidence 701 places the following restrictions on lay testimony:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Accordingly, Plaintiff's testimony is limited to opinions based on his own perception of the incident. However, to the extent Defendants seek to prevent "Plaintiff from offering *any* evidence or testimony regarding any use of force, other than his personal observations," ECF No. 98 at 3-4 (emphasis added),

1    this Court denies this request as overly broad and not supported by the authority

2    cited.

3         Second, this Court grants Defendants' second request, to the extent it limits

4    evidence of Plaintiff's medical condition not provided to Defendants during

5    discovery.  Under the Federal Rules Civil Procedure, a party has a duty to

6    cooperate and comply with the discovery process.  *See* Fed. R. Civ. P. 37.  On

7    November 19, 2014, and then again on December 17, 2014, this Court ordered

8    Plaintiff to provide signed medical releases to Defendants.   ECF No. 157, 166.  As

9    of the date of this Order, Plaintiff has yet to comply.  Federal Rule of Civil

10   Procedure 37 provides the following sanctions for failure to obey a discovery

11   order:

12        If a party . . . fails to obey an order to provide or permit discovery . . .
          the court where the action is pending may issue further just orders.
13        They may include . . . prohibiting the disobedient party from
          supporting or opposing designated claims or defenses, or from
14        introducing designated matters in evidence . . . .

15   Fed. R. Civ. P. 37(b)(2)(A)(ii).   Accordingly, if Plaintiff fails to provide

16   Defendants the medical authorizations, he will be prohibited from introducing his

17   medical records into evidence at trial.

18        Finally, this Court grants Defendants' third request, to the extent it limits

19   evidence of Defendants' insurance coverage to prove wrongdoing.  Federal Rule of

20   Evidence 411 prohibits evidence of a parties' insurance coverage to prove it acted

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 42

negligently or otherwise wrongfully.  Fed. R. Evid. 411.  Accordingly, Plaintiff is prohibited from referring to Defendants' insurance coverage in an effort to prove Defendants' culpability.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

    1.  Lieutenant Doe and Eight Unknown Employees of Spokane County are **DISMISSED** with prejudice.

    2.  Defendant Smiths' Motion for Summary Judgment (ECF No. 64) is **DENIED.**

    3.  Defendants' Motion for Summary Judgment (ECF No. 74) is **GRANTED in part** and **DENIED in part**.  Defendant's Motion is **GRANTED** concerning Plaintiff's excessive force claim, as against Defendants County of Spokane, Knezovich, and McGrath; and Plaintiff's unreasonable search claim, as against Defendant Knezovich.  As indicated herein, Defendant's Motion is **DENIED** as to all other claims.

    4.  Defendants' Joint Motion to Exclude Testimony of Winthrop Taylor (ECF No. 70) is **GRANTED in part and DENIED in part**.

    **5.**  Defendants' Joint Motion in Limine (ECF No. 95) is **GRANTED in part and DENIED in part**.

    6.  Plaintiff's Supplemental Motion in Opposition to Defendant's Joint Motion in Support of Defendant's Motion to Exclude Testimony of

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT ~ 43

Winthrop Taylor (ECF No. 158) is **GRANTED in part and DENIED in part.**

The District Court Executive is hereby directed to enter this Order, provide

copies to the parties, and adjust the caption of the case accordingly.

**DATED** December 22, 2014.



THOMAS O. RICE
United States District